Case Number 251807. Good morning, may I proceed? Good morning. You know what? Hold on one second, please. You lost your audience. Well, except us. Your principal audience, I hope. We don't have the high school team here as well. Good morning. Good morning, Your Honor. May it please the Court. My name is John Ruskoski. I represent Makina Ve Kimya Endustrisi for MKE. This case involves MKE's damages and the confusion of many customers caused by defendant's willful fraud and the attorney fees caused by that fraud as well. Due to the misstatements made by defendants, including Ms. Cross personally, prior to the litigation and in the litigation, significant discovery was required to uncover the complete facts about how many customers had been defrauded as well as other things that caused attorney's fees. And all this works against the backdrop of the Lanham Act, which has dual goals. To protect trademark owners, but as part of that, to deter similar acts from taking place. All right. You just said that some of what happened with Ms. Cross and the ASAP parties led to the need for more extensive litigation. By my, and so that feeds into the need for attorney's fees. By my read of the district court docket, it looks to me like within somewhere between 4 days and 12 days from when the defendant parties either waived service or were served, the stipulated injunction was entered and all of the relief that your client eventually obtained was secured. That within the first 10 days of litigation, and I count that not from the filing again, but from service, but within the first couple of weeks of litigation, all of the relief eventually secured had been obtained. And so why are you, I get that a prevailing party is a macro concept, but when the court has discretion and it's only in an exceptional case, why are you entitled to attorney's fees to get nothing more between day 12 and the final day of the district court proceedings? For three reasons. And I guess I'll gently push back on the idea. Certainly by the time, I believe you're referring to the preliminary injunction that stopped the infringement. But there were additional things that needed to take place. First of all, even after the preliminary injunction took place, there was already a determination that had been withheld throughout the pre-discovery and discovery period about this website that was further litigating or publishing to the public that ASAP had this exclusive license. And we'll get back to that in a second when we talk about the importance of the damage. So there was an additional source of violation that wasn't covered by the preliminary injunction, but is covered by the permanent injunction. Correct. So that's number one. Number two was determining the total source and how far this fraud had been widespread. Again, taking a step back, the way MKE learned about this was in a public forum. They were at what's called the SHOT Show, one of the largest trade shows in the country, where they were angrily approached by a customer saying, how could you defraud me like this in front of a group of individuals? Now, when we approached that, that's what we knew about. We didn't have discovery, and there were some pre-discovery discussions. And there was an insistence that that was the only, in other words, that there was no effort to come clean. What was said, both in interrogatory responses, sworn interrogatory responses, signed by Ms. Cross, as well as to Judge Gardefee. And again, I don't fault Mr. Mandel for relying upon his client, but what he represented to the court at that time, Judge Gardefee, was there was only one occasion this took place. That was the party M42. But the preliminary injunction, whatever had been happening, didn't the preliminary injunction say no more, full stop, no use of MKE's name, trademark, symbol, anything, however many instances it appears in? But that does not address the damage or the confusion caused to others. But you didn't win on damages. So if we don't reverse on the damages question, if the net total of this, of the relief you succeed in getting, is the permanent injunction, you had all of that relief two weeks in, right? We did. But let me tell you, at least suggest to you, two reasons why that doesn't matter again. Because at the end of the day, going back to the Coach case, this Second Circuit's opinion, going back to 2022, damages are not a predicate in order to obtain attorney's fees. Right. Just clear stuff. The pillars that we look at is, was there willful infringement? And certainly, I'm not suggesting willful infringement alone is enough, but that's certainly a strong factor about willful infringement and bad faith, as well as what it took to get there, to unravel the customer confusion. Because we're dealing with a situation that was much, much more widespread than just one customer. That one customer that approached us, again, angrily at a trade show, bringing this to light in the first place, which caused issues in the first place. So we're not just looking at an injunction to stop it. We're looking at trying to address the root cause. And the root cause here was determined through very necessary discovery. And how did the stipulation of the final judgment, how did that implement additional corrective relief about things you learned in discovery, for example, that was not implemented and available and instituted through the preliminary injunction? In four ways, at least, I'd suggest to you. So one way that was done was determining the true scope of the customer confusion so that MKA could take appropriate steps, as well as to make sure this is kind of a twin pillar of that, that there's appropriate deterrence to make sure similar events don't take place. Well, but that, I don't understand how that's relief. It's helpful in information, but I, and so discovery was interesting and valuable to you, maybe, is what you're saying. But I'm asking you, if you put side by side the preliminary injunction and the permanent injunction, I'm still not hearing anything that actually is additional relief from the court, because it's a judicially sanctioned change in the party's relationship. So what is the additional judicially sanctioned change implemented by the final that's not preliminary? The additional sanction, again, we're not looking just at stopping the confusion. We're looking at unraveling and addressing the confusion in the first place. So how is that, how is the unraveling judicially sanctioned change in the relationship? Going back to the four ways, and I recognize I'll rely upon the first one that I shared, which was important to discover the true scope of the confusion that was caused here. So that's number one. Number two, we talked about the website. The website wasn't just Ms. Cross directly reaching out to people. It was a public ability to reach out to others. Again, creating an impression on the internet, a widespread forum available to all, suggesting that there was an exclusive license held by the ASAP parties to take these actions. The third relates to the more general idea of what were the damages and what were the advertising that caused by that. Now, I realize that's not addressed in the stipulation, so perhaps I'm getting a little bit of field in that regard. But to address that, part of the other argument that was made that was necessary for the stipulated judgment was that Ms. Cross continued to insist near to the end that she had the permission to do this. Now, discovery was necessary to show that was not true and that she knew that was not true. Because what she had was she had a business card from a party saying they're authorized in South Korea, not in the United States, but in South Korea, to take the acts she did, both directly with at least seven groups of customers that we learned about, as well as on the internet. So when you look at that, it was necessary as part of that stipulated judgment to address that root cause that was being spread out, that somehow there was permission given for what she was doing. So the stipulated judgment also addressed that problem, as well as the fact, and tying it back to the discovery issues, Judge Miriam, this was something where it was insisted throughout that, well, she wasn't aware that it was just South Korea. But what was discovered in the chat records that were first produced by ASAP, but redacted to cover up these messages, she knew that in June and July of 2021, before she continued with the TD group to try and execute a contract, active negotiations to execute a contract, before she continued with the M42 group, right on the cusp of a contract, before they traveled to Serbia to determine that her lies were untrue, and then approached MKE angrily to form. So that was an additional aspect that discovery was absolutely necessary. We're not just from the parties, but we had to go to Mr. Asserer and others to obtain that discovery to show that that was simply not true. And what is it, I've got the stipulated final judgment open. Where do I find the relief relating to that factor in here? I'm sorry, so the stipulated final judgment. Right. Because what I'm asking you is, and we're going to move on from this now, because I've occupied all of your time and not let my colleagues. These were questions I would have tried to answer in any event. I appreciate, Judge Miriam. So the stipulated final judgment, I don't have in front of me. These were addressed as part of the pretrial submissions, which then led to the stipulated pretrial judgments. I believe it's paragraph 17, 21, and 22. I'm looking at the stipulated final judgment. Some attorneys use. Yes. And I'm asking you, where in the stipulated final judgment does it, because what you're telling me is the reason that there's a difference between the preliminary and the final is those four things. Okay. And what I'm saying is you need to take one step back, if I respectfully submit, and look at what was the pretrial submission that led to that stipulation. In the pretrial stipulation, I believe it's A251 as part of the record. I could be wrong on that. But as part of the pretrial submissions, that's where, you know, as part of that pretrial submission process, those lies came to bear. That there was. Okay. So it's not in the stipulation of judgment. Correct. It's the pretrial. I understand you're telling me there's other documents that talk about it. What I am asking you, the actual judgment that determines the rights of the parties as judicially sanctioned does not include a specific reference to these things. It does not, Your Honor. But that's also, I certainly wouldn't suggest that the stipulated final judgment ignores the history that brought us there in the first place. No, no. It's just that in light of all these submissions, y'all have agreed on something. But it doesn't say the court orders that this website be taken down and this person be called and told Ms. Cross was lying and that this business card be turned over and never used again, right? It does not. But that's because we took the time and had to extend the energy to address those steps in the first place, which led to the decision by the defendant, rather than to face a public trial, that they would stipulate to those things, including willfulness. Again, the core of their willfulness argument was that they did not act willfully because they had permission. But discovery, again, pulled every step of the way, showed that wasn't true, including through the redactions to the chat records. I know I reserved some time, I think only a minute. Perhaps I should save that remaining rebuttal time to address any other questions or to address those positions. Thank you. Thank you. May it please the Court. I'm Richard Mandel of Callan-DeBoertson-Lattman for the appellees, ASAP defendants. Judge Subramanian correctly determined on summary judgment to dismiss all claims for monetary relief, and he also correctly denied MKE's motion for attorney's fees. And I think the critical point here is what Your Honor was getting at. Right from the outset, our client came in, they stipulated to a preliminary injunction, and the case was essentially over for all purposes. The use of the mark had stopped. There was nothing to fight about. Nobody was claiming a continuing right. To use this trademark. And all the things that Mr. Ruskoski is talking about in the permanent injunction, they're not, none of that is addressed. You know, the preliminary injunction stopped all use, any use against any customer, and the permanent injunction made that final that we weren't going to use as we hadn't been using for some time. And the reality of the situation is that very early on in November of 2022, after the preliminary injunction had been entered, we were in front of Judge Gardefee, and he said to the parties quite clearly what would be irrational here is to litigate for two more years, you know, it's going to be very hard to prove any monetary damages. There were no sales here that were ever made. And what makes sense is for this to just be ended. And instead, MKE insisted on litigating this case for two years, pursuing multimillion dollar damage claims, hiring an expert who they brought in and presented theories that Judge Subramanian said did not even come close to being something that could be presented to a jury. And... But he's, your adversary is taking the position that the resolution that the district court came to basically lets your client off scot-free for dishonest and illegal conduct. I don't think so, Your Honor. The bottom line is the plaintiff has to prove damages. And they couldn't prove it. They had no admissible evidence to prove it. It's not unusual in a trademark case to not get damages. An injunction is often the form of relief that you get. Now, the defendant never made a single sale here. That's undisputed. So it's not like there were sales that were ever made. The plaintiff had the burden to come forward with admissible evidence that would prove that they suffered harm in some way. And what Judge Subramanian found is they completely failed to do that. Their claim for corrective advertising, they said that they spent millions of dollars in corrective advertising. They never produced the ads. They never showed any, they never put in a witness who said, here's the corrective advertising we ran. Here's why we had to run it. They pointed to a general increase in a category of marketing, sales, and distribution that their expert conceded included all kinds of things other than advertising. So there was just no admissible proof in front of the court to sustain that claim under the law. And Judge Subramanian correctly said that there's no basis for it. And with respect to the reasonable royalty remedy, which is the other remedy they're appealing here, you know, the law is pretty clear on that, that it's atypical in trademark cases, generally reserved for situations in which there's an existing licensing arrangement between the parties. That didn't happen here. You had none of the indicia that would make a reasonable royalty an appropriate remedy here. You had no prior licensing arrangement between the parties. You had no licensing whatsoever of the MKE trademark to anyone, not just to the defendant, but to any party. You had no infringing sales. You had no projections of any sales that defendant would have made, that the plaintiff had, you know, expected to make in the U.S. market. You had an erratic sales history in which the plaintiff hadn't made a single sale in the U.S. market in the previous four years. And then you had some unconsummated transactions that were completely unlikely to have ever been fulfilled by this plaintiff. Given all that, Judge Subramanian correctly found as a matter of law that a reasonable royalty remedy would be completely speculative under these circumstances. And on top of all that, you have that even if this was the unusual case in which you were going to award a reasonable royalty, Judge Subramanian found that the comparables that were being relied on for by MKE's expert were far from comparable. They involved different forms of intellectual property, different products. They involved different territories, and they involved, you know, celebrity endorsement deals. They were very far afield. And so the judge correctly decided under Daubert that even if I was thinking that this was a proper fit for a reasonable royalty, which I don't, this — there's no evidence here that passes muster under Daubert. So the bottom line is we litigated for two years, and all of the claimed damages were utterly devastated and thrown out, and most of their expert's report was thrown out. They tried to rely on hearsay statements from MKE to their expert that their expert didn't even put in the report. And it's not a proper basis under Marvel Characters v. Kirby. This Court has made clear that even though an expert can rely on hearsay, that doesn't become a basis to put hearsay evidence in for the truth of the matter. There was no actual evidence to show there was ever any corrective advertising done here. Given all of that background, the Court was clearly within its discretion to decide this was not an exceptional case in which to award attorney's fees. And, you know, the Supreme Court has made clear in Octane Fitness that willfulness is not alone the standard. There were plenty of cases even before Octane Fitness in which attorney's fees were denied notwithstanding willfulness. After Octane Fitness, it's even more common, and this Court in Four Pillars said that, you know, willfulness does not create any presumption of attorney's fees. And I think the practical reality is you look at the totality of the circumstances. What the Court said here is, as a practical matter, this is a case that should have been closed up, you know, right from the outset. They said mea culpa. They came clean. And the things that, you know, Mr. Ruskoski is talking about are not even established in the record. He's talking about this website. You know, and Ms. Cross testified that the website got pulled down within a couple of weeks of August of 2022 when she came in and voluntarily talked to the other side right when they brought the lawsuit. They never moved for contempt, and they were filing plenty of motions because they filed a motion unsuccessful to try and get certain relief, you know, on other things. The only evidence of the website is all dated before September. So it's just not brought up by the record. And in terms of finding out the scope, they didn't uncover any other entities that proved to be meaningful in any way. And we produced in discovery all the documents that showed whatever we were trying to do. They had all that. They couldn't turn any of that into a viable claim for damages. And Judge Subramaniam was well within his discretion in deciding that this is not an appropriate case for attorney's fees, given all of the factors, including MKE's own inability to prove damages and its own conduct. And unless the Court has any questions, we rest on our break. Thank you. Thank you. Just briefly, Judge Miriam, I gave you a cite earlier of A251. It should be A541. So my apologies for that error. Just turning to three points that I think are important to make here. Under the Deering case, it's a Second Circuit 1959 case that allowed reasonable royalties in the trademark infringement case. There's no circuit directive that you need to have an established license relationship. There's none. And, you know, when we look at various other cases, the influx of other cases throughout the country, I can't point to a Second Circuit case because it's not been decided here, but other cases saying, especially in the internet age, that you do not need that prior licensing relationship. Here with that backdrop in mind, really in terms of the damages, there's two key things we want to reemphasize in terms of the errors of the Court. The first is in terms of the reasonable royalty. Judge Sobranium just didn't think their parties would have a hypothetical negotiation. That exceeded his role as a gatekeeper. He was weighing disputed facts rather than looking at the evidence presented where both sides admitted MKE uses distributors, that they get paid a commission or the equivalent of a royalty. On the other hand, ASAP does the same, recognized they need to do the same. Just to wrap up that thought then as well, similarly relating to the corrective advertising, there was fact-finding going on, not just gatekeeping. And even perhaps the most, you know, striking one of those is saying, well, I don't know who that was that spoke to Ms. O'Neill, even though in Ms. O'Neill's deposition, she said it in the record, both page 701 and 751, that it was Mr. Topoloma. So the ---- Although he wasn't disclosed in the interrogatory responses as one of the people with information about this. He was disclosed separately in the initial disclosures, not in the interrogatory response. Not in response to the specific question about damages. That's correct. He was not the person in that regard. But he was disclosed in the disclosures, Your Honor, in that regard, as well as the fact that it was just wrong to say that person wasn't identified when it was. He's also referenced in paragraph 47 of Ms. O'Neill's report. With that, I've seen I've exceeded my time. Thank you very much for your time. Thank you for your decision. Thank you both. Today's argument calendar, and we'll, I'll ask the Court Deputy to please adjourn the  Court is adjourned. Thank you.